McNally v. Town of Leeds et al., Complaint

Amanda M. Hansen (17227)
Nathaniel F. McKean (17273)
BEAR Law Group
532 N Colorado St, Salt Lake City, UT 84116
(801) 448-6167
bearlawgroup@outlook.com

*Attorneys for Plaintiff*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH
## SOUTHERN DIVISION

| | |
|---|---|
| DORIS MCNALLY and DANIELLE STIRLING, <br><br> Plaintiffs, <br><br> vs. <br><br> TOWN OF LEEDS, a Utah municipality; WILLIAM HOSTER, individually; and TROI GEE HOSTER, individually, <br><br> Defendants. | **COMPLAINT FOR FIRST AMENDMENT RETALIATION, EQUAL PROTECTION VIOLATIONS, DUE PROCESS VIOLATIONS, CONSPIRACY TO INTERFERE WITH CIVIL RIGHTS, DEFAMATION, AND RELATED CLAIMS** <br><br><br> Case No. 4:26-cv-45 _____ <br><br> Judge _____ |

## I. INTRODUCTION

Plaintiffs Doris McNally and Danielle Stirling bring this action against the Town of Leeds, former Mayor William Hoster, and Troi Gee Hoster for violations of Plaintiffs' constitutional rights and related state-law torts. This case arises from a sustained campaign by Mayor Hoster to weaponize the authority of his office against anyone who threatened to expose financial irregularities in his administration that personally benefited him. Mayor Hoster's wife entered the same Town Council race as Plaintiff McNally.

Two sitting councilmembers were already aligned with Mayor Hoster, one through a dual employment conflict and the other as a political ally. A third allied seat would have ensured a

council majority favorable to Mayor Hoster after his term ended. Mayor Hoster systematically attacked his wife's political rival through false accusations of criminal conduct timed to the November 2025 election, retaliated against a councilmember who requested a financial audit, and terminated the Town Clerk without required Council approval. The Town Council knowingly permitted this campaign, and Mayor Hoster's wife actively furthered it.

Using the municipal Facebook page, Town-funded legal counsel, and official Town Council meetings, Mayor Hoster publicly accused Plaintiffs of criminal conduct he knew to be false. He did so having been told directly by the contractor at the center of the dispute that the matter was a simple clerical error and that Plaintiffs bore no fault. He timed those accusations to inflict maximum damage during the precise window when ballots were being mailed to voters in the November 2025 election, in which his wife was a candidate opposing Plaintiff McNally.

During the October 8, 2025 Town Council meeting, Town-funded legal counsel publicly accused Plaintiff Stirling of criminal conduct before the Council and the public. Meanwhile, Plaintiff Stirling was in northern Utah, attending her dying mother-in-law. She learned of the accusations only when her phone began buzzing with calls from attendees.

This conduct was not an isolated act. Mayor Hoster had previously filed criminal charges against a former councilwoman who gave unflattering testimony at a public meeting, terminated the Town Clerk without required Council approval, and dispatched law enforcement to the home of a citizen who insulted him at a council meeting. This was a documented pattern, known to the community, of using governmental power to punish public critics.

The harm was direct and substantial. Plaintiff McNally lost her Town Council race by less than twenty votes. The Town Council, aware of Mayor Hoster's conduct throughout, made no attempt to censure or stop him.

McNally v. Town of Leeds et al., Complaint

After the election, Defendant Troi Gee Hoster continued the defamatory campaign, falsely telling voters at a subsequent water board election that Plaintiff McNally had "misappropriated town funds."

Plaintiffs seek compensatory damages, punitive damages against the individual defendants, attorneys' fees under 42 U.S.C. § 1988, and declaratory relief.

# TABLE OF CONTENTS

I. INTRODUCTION ............................................................................................................... 1

II. PARTIES.......................................................................................................................... 4

III. JURISDICTION, VENUE, AND RELATED PROCEDURAL MATTERS........................... 4

IV. STATEMENT OF FACTS ................................................................................................. 5

    A. Background on Mayor Hoster's pattern of misconduct: .......................................... 5

    B. Mayor Hoster's initial attacks on Plaintiff McNally:............................................... 8

    C. Mayor Hoster's retaliation against Plaintiff Stirling's protected speech and oversight:....... 10

    D. Mayor Hoster weaponizes Town legal counsel and accuses Plaintiffs of criminal acts:..... 12

    E. Continuing retaliation and defamation ................................................................ 15

    F. Harm to Plaintiffs: ............................................................................................... 18

    G. Mayor Hoster's abuse of mayoral authority; Town's enabling of this abuse: .................... 18

V. CLAIMS FOR RELIEF ................................................................................................... 21

    COUNT I: First Amendment Retaliation (42 U.S.C. § 1983) ................................... 21

    COUNT II: Due Process (Stigma-Plus) (42 U.S.C. § 1983, Fourteenth Amendment) ............ 22

    COUNT III: Equal Protection / Religious Discrimination (42 U.S.C. § 1983)....................... 24

    COUNT IV: Conspiracy to Interfere with Civil Rights (42 U.S.C. § 1985(3))...................... 25

    COUNT V: Conspiracy Under 42 U.S.C. § 1983 ................................................... 27

    COUNT VI: Defamation (Common Law)................................................................ 28

    COUNT VII: Defamation (Common Law)............................................................... 30

    COUNT VIII: Civil Conspiracy (Common Law)..................................................... 32

    COUNT IX: Intentional Interference with Prospective Electoral Relations (Common Law).. 33

VI. JURY DEMAND............................................................................................................. 35

VII. PRAYER FOR RELIEF ................................................................................................. 35

LIST OF EXHIBITS:.......................................................................................................... 37

McNally v. Town of Leeds et al., Complaint

## II. PARTIES

1. **Plaintiff Doris McNally** ("Plaintiff McNally") is a resident of Washington County, Utah. She is the volunteer Sexton for the Town of Leeds municipal cemeteries for four years, a member of the local water board for eleven years, and was a 2025 candidate for the Leeds Town Council.

2. **Plaintiff Danielle Stirling** ("Plaintiff Stirling") is a resident of Washington County, Utah. She has a total of over 26 years as a volunteer leader, first on the water board, then on the planning committee, then as a member of the Leeds Town Council for eight years.

3. **Defendant Town of Leeds** (the "Town" or "Leeds") is a municipality and political subdivision of the State of Utah, located in Washington County, and is a proper defendant under 42 U.S.C. § 1983. *Monell v. Department of Social Services*, 436 U.S. 658 (1978).

4. **Defendant William "Bill" Hoster** ("Mayor Hoster") is a resident of Washington County, Utah. He served as Mayor of the Town of Leeds from January 2022 until his term ended in January 2026, and simultaneously served as Chairman of the local fire district board. He is sued in his individual capacity.

5. **Defendant Troi Gee Hoster** ("Mrs. Hoster") is a resident of Washington County, Utah. She is the wife of Defendant William Hoster and was a 2025 candidate for the Leeds Town Council. She is sued in her individual capacity. She is not a government employee or official, and the Utah Governmental Immunity Act does not apply to claims against her.

## III. JURISDICTION, VENUE, AND RELATED PROCEDURAL MATTERS

6. This Court has subject-matter jurisdiction over Plaintiffs' federal claims under 28 U.S.C. §§ 1331 and 1343(a)(3)-(4), as this action arises under the Constitution and laws of the United States, including 42 U.S.C. §§ 1983 and 1985, and supplemental jurisdiction over Plaintiffs' state-

4

law claims under 28 U.S.C. § 1367 because those claims arise from the same case or controversy.

7. Venue is proper in the Southern Division of the District of Utah under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims occurred in Washington County, Utah.

8. Plaintiffs served a Notice of Claim under the Utah Governmental Immunity Act (UGIA) by personal delivery to the Leeds Town offices on or about October 17, 2025, and served a second Notice of Claim by personal delivery on or about February 13, 2026. *See* Utah Code § 63G-7-401 through -403. Individual capacity § 1983 claims do not require UGIA notice. All conditions precedent to the state-law claims have been satisfied.

## IV. STATEMENT OF FACTS

*(All events took place in Leeds, Utah, unless otherwise stated.)*

### A. Background on Mayor Hoster's pattern of misconduct:

9. The Town of Leeds is a small rural community of approximately 840 residents in Washington County, Utah. During the period relevant to this complaint, it was governed by a mayor and a four-member Town Council. Mayor Hoster served as mayor and Plaintiff Stirling served as a Town Councilmember until January, 2026.

### 1. Mayor Hoster's history of attacks on critics through governmental authority:

10. Mayor Hoster demonstrated a documented pattern of using the authority of his office to punish and intimidate citizens who publicly criticized him, including former Councilmember Lori Hunsaker, citizen Daniel Brown, and former Town Clerk Michelle Rutherford.

11. In late 2024, a citizen read a letter at a public Town Council meeting accusing Mayor

Hoster and his business partner of pressuring her and her mother into an unwanted real estate sale. Former Councilwoman Lori Hunsaker confirmed that account on the record. Mayor Hoster subsequently initiated criminal charges against Ms. Hunsaker in Washington County Justice Court, Case No. 251500983, personally visited the County Attorney's office to press for prosecution, and told Councilwoman Stirling that he was close friends with the County Commissioners, who were willing to "do anything he wants." The charges were later dismissed.

12. In May 2025, Mayor Hoster terminated Town Clerk Michelle Rutherford without the statutorily required prior approval of the Town Council. He then contested her unemployment benefits (the Town lost) and filed criminal charges against her, including two felonies, both of which were dismissed. At the May 14, 2025 Town Council meeting, Mayor Hoster cut Ms. Rutherford's public comment short, called a point of order to silence a Councilmember who attempted to thank her on the record, and threatened to call the Sheriff when the audience reacted. Ms. Rutherford's claims are the subject of *Rutherford v. Town of Leeds*, Case No. 4:26-cv-00028 (D. Utah).

13. At the May 14, 2025 Town Council meeting, Daniel Brown called the Mayor a vulgar name in response to the mayor belittling Councilwoman Peot. In reaction, Mayor Hoster called the Washington County Sheriff's Office. Deputies visited Mr. Brown's home and conveyed that Mayor Hoster "still reserved the right to pursue charges regardless." (Exhibit 3).

14. These incidents were known to community members, including Plaintiffs, and established a credible pattern: Mayor Hoster used law enforcement, criminal charges, and official governmental processes to punish anyone who publicly opposed him.

**2. Mayor Hoster's history of religious discrimination:**

15. Mayor Hoster demonstrated a pattern of preferential treatment toward LDS community

members and hostility toward non-LDS residents.

16. On May 28, 2025, citizen Robin Snyder stated during public comment at a Town Council meeting that when she complained to Mayor Hoster about a neighbor, his first response was that the neighbor "does things for the church," after which he ignored her complaints. Ms. Snyder stated on the record: "I go to church, I'm just not a Mormon, so excuse me, but that's exactly what came out of your mouth. You could shake your head all you want and roll your eyes back. You know that was the truth." This statement is documented in the official Town Council meeting minutes.

17. Plaintiff McNally is not LDS. Mayor Hoster's differential treatment of Plaintiff McNally, detailed below, was consistent with and motivated in part by this pattern of religious favoritism.

**3. Mayor Hoster's history of financial self-serving and conflicts of interest as mayor:**

18. Mayor Hoster owns EMS Logik, a private company. Upon becoming mayor, he secured appointment as Chairman of the Hurricane Valley Fire Special Service District (HVFSSD) Administrative Control Board.

19. Within 37 days of that appointment, EMS Logik invoiced HVFSSD $33,142.50 for its products. From 2022 through 2025, HVFSSD paid EMS Logik a cumulative $47,469. No conflict of interest was ever disclosed. No competitive bidding occurred.

20. Councilman Kohl Furley simultaneously served as a Leeds Town Councilmember and as HVFSSD Deputy Fire Chief, a position to which he was promoted in March 2024 while Mayor Hoster served as HVFSSD Board Chairman. Under the HVFSSD Employment Manual adopted in December 2023, the Board Chairman holds direct authority over employee discipline and termination appeals, meaning Furley's continued employment was subject to Mayor Hoster's authority. Furley voted with Mayor Hoster on every contested council matter, including voting to table Plaintiff Stirling's audit request. He used his HVFSSD email address to conduct Leeds Town

7

business. (Exhibit 15). This dual-role conflict was never disclosed.

**B. Mayor Hoster's initial attacks on Plaintiff McNally:**

21. Mayor Hoster perceived Plaintiff McNally as a political rival, first as a potential opponent for himself and then for his wife. Throughout 2025, he used his authority as mayor to systematically eliminate her public-facing roles, exclude her from candidate events, and use official Town platforms to attack her politically and personally.

22. As early as late 2024, before Plaintiff McNally had declared any candidacy, Mayor Hoster perceived her community involvement as a political threat, claiming 'everything she did was to build her resume.' In November 2024, when Plaintiff McNally proposed a 'Small Business Saturday' promotional effort through the Bloom Committee, a volunteer group that organized community events and beautification projects, Mayor Hoster accused her of using it to advance a political campaign, threatened to dissolve the committee, and made a condescending comment that he was already accommodating her with the "cemetery stuff."

23. In January 2025, he followed through and unilaterally dissolved the committee without consulting its members, stripping Plaintiff McNally of her role as committee member. He justified the dissolution in the Town newsletter by claiming the committee had become burdened with 'overburdened accounting, excessive formal procedures, and meeting minutes that detracted from its primary purpose.' (Exhibits 1, 2, & 14)

24. Mayor Hoster's wife was subsequently a candidate in the 2025 Leeds Town Council general election in which Plaintiff McNally was also a candidate. In the August 2025 primary, Plaintiff McNally received the second-highest vote total (149); Mrs. Hoster received the fewest among the four advancing candidates (107). (Exhibit 20)

25. In her capacity as a member of the Leeds Domestic Water-users Association (LDWA) board, Plaintiff McNally had given monthly LDWA reports at Town Council meetings for a decade. In February 2025, Mayor Hoster curtailed her LDWA reports in the Town Council meeting agenda, reducing that longstanding public platform. (Exhibit 1)

26. Mayor Hoster and Mrs. Hoster jointly asked the Bishop of the Leeds Second Ward to host a 'Meet the Candidates' event at his personal residence. Mrs. Hoster served as Relief Society President for that same ward. Mayor Hoster promoted the event using official Town communications channels, including the Town Facebook page and the electronic sign in front of Town Hall. Only LDS candidates were invited to participate. Plaintiff McNally, who is not LDS, was not among them. Upon information and belief, this exclusion was through no fault or knowledge of the LDS Bishop, who later acknowledged he would have given more thought to how the arrangement might appear. (Exhibits 2 & 4).

27. Mayor Hoster also used his authority to suppress an independent citizen-organized candidate forum. Through his political ally, Councilman Ron Cundick, he had a museum reservation for that forum canceled because he intended to run his own event. The reservation was restored only after community complaints. (Exhibit 4)

28. Mayor Hoster assumed administrative control of the Town's official Facebook page around the time he terminated Town Clerk Rutherford and used it as a personal and political instrument throughout 2025. On April 4, 2025, he used the page to announce his own reelection campaign (which he later withdrew from). On September 3, 2025, he posted campaign promotion for his wife, including promotional images and a link to Troi4Leeds.com; no comparable post was published for any other candidate, and the post was later removed. (Exhibits 6 & 9.

29. In June 2025, Plaintiff McNally publicly questioned the administration and transparency

of the Town's official Facebook page, noting that no administrators were listed and asking whether the Town Council could clarify its purpose. Rather than address her question, Mayor Hoster responded on the page: 'oh bless your heart,' a phrase widely understood as a condescending dismissal. Plaintiff McNally subsequently adopted the phrase in her campaign slogan: 'Bless My Heart I'm Running for Leeds Town Council.' (Exhibits 1 & 10). Mayor Hoster made further attacks against both Plaintiffs on the Town Facebook page following the September Town Hall meeting, detailed in Section E below.

### C. Mayor Hoster's retaliation against Plaintiff Stirling's protected speech and oversight:

30. Plaintiff Stirling served on the Leeds Town Council for eight years. In 2025, she publicly questioned Mayor Hoster's decision to hold a candidate forum at an LDS Bishop's home and led an effort to audit the Town's finances. Mayor Hoster responded to each act with escalating retaliation, culminating in the public accusations at the October 8 Town Council meeting described in Section D below.

31. On July 23, 2025, Plaintiff Stirling published a message about the "Meet the Candidates" event, writing that "only candidates of the faith were invited to participate" and stating: "I will never condone that kind of exclusion... Faith can be a beautiful guide in our lives, but it should never be a gatekeeper to community leadership." (Exhibit 12). The following day, Mayor Hoster used the Town's official Facebook page to post a response as administrator, titled "Setting the Record Straight: Clarifying Recent Claims by Councilwoman Stirling," in which he accused Plaintiff Stirling of "misleading attacks and false accusations that warrant clarification and an apology," called her claims "false, inflammatory, and irresponsible," questioned her "loyalty" to the community, and demanded a public apology. (Exhibit 11).

10

McNally v. Town of Leeds et al., Complaint

32. In her capacity as a Town Councilmember, Plaintiff Stirling participated in investigations into Mayor Hoster's financial self-dealing. Known or suspected irregularities included the $47,469 in payments from HVFSSD to Mayor Hoster's company EMS Logik described above, Mayor Hoster's authorization of a $221,972 road repaving project without proper procurement or prior Council approval, and his unilateral donation of $10,000 in Town funds to the Washington County Sheriff's Department without Council authorization. The $10,000 donation matched the contribution made to the same Sheriff's Department program by the City of St. George, a municipality with a population roughly 120 times that of Leeds.

33. These irregularities were further surfaced by a September 2025 GRAMA request filed by a Town resident. Plaintiff Stirling worked with that resident and Councilman Furley to prepare a letter requesting a full audit. On September 24, 2025, Plaintiff Stirling read the letter at a Town Council meeting, calling for a full audit and review of budget transparency, purchasing policies, and the duties of elected officials. Her statement did not mention Mayor Hoster personally. (Exhibit 16).

34. Mayor Hoster responded by email on September 30, 2025, characterizing Plaintiff Stirling's transparency concerns as an "agenda of paranoia" and accusing her of attempting "simply to hold a short leash." (Exhibit 2).

35. A subsequent Agreed-Upon Procedures engagement conducted by HintonBurdick, PLLC confirmed many of Plaintiff Stirling's concerns, finding the Highways and Streets Department over budget by $165,372, disbursements not approved by appropriate personnel, limited use of purchase orders or competitive bids for purchases over $1,000, and no Fraud Risk Assessment completed for fiscal year 2025. (Exhibit 24)

McNally v. Town of Leeds et al., Complaint

**D. Mayor Hoster weaponizes Town legal counsel and accuses Plaintiffs of criminal acts:**

36. Prior conflicts between Mayor Hoster and Plaintiffs McNally and Stirling escalated to the October 8, 2025 Town Council meeting, at which the Town's outside legal counsel, the law firm of Bennett Tueller Johnson & Deere ('BTJD'), publicly accused both Plaintiffs of violating Utah law by allegedly executing an unauthorized contract on behalf of the Town in connection with the cemetery renovation project. Those accusations were based solely on information Mayor Hoster provided that was deliberately misleading and factually inaccurate.

**1. Background on the LandWorks Cemetery Renovation project and accounting error:**

37. In early 2025, Plaintiffs McNally and Stirling, in their respective roles as cemetery Sexton and Town Councilwoman, approached LandWorks Inc. regarding renovation of the Town's cemeteries. The Town Council approved LandWorks's bid of $9,150 on or around February 26, 2025. LandWorks presented its cemetery designs at the May 14, 2025 Town Council meeting; Mayor Hoster was present, raised no objection, and the minutes reflect the presentation was well received. (Exhibit 21).

38. In August 2025, a clerical error by LandWorks' office manager resulted in an incorrect invoice to the Town. On August 26, 2025, Mayor Hoster left a phone message for LandWorks President James Dotson inquiring about the additional costs and warning that if Mr. Dotson did not respond, the matter would be passed on to legal. Mr. Dotson returned the call, explained that the invoice was a simple clerical error on LandWorks' end, and asked Mayor Hoster to delete the erroneous invoice. Mr. Dotson confirmed that no funds had exchanged hands and that neither Plaintiff had contracted for or paid any funds beyond the approved amount. Rather than accept this explanation, Mayor Hoster lectured Mr. Dotson on municipal contracting procedures and inferred malfeasance or criminality on the part of LandWorks, Plaintiff McNally, and Plaintiff Stirling.

12

McNally v. Town of Leeds et al., Complaint

(Exhibit 17).

**2. Mayor Hoster uses error to accuse Plaintiffs of fraud, knowing the accusation to be false:**

39. Mr. Dotson subsequently informed Plaintiff Stirling that Mayor Hoster had told him he was 'actively obtaining all materials for a suit against Danielle Stirling and Doris McNally.' Despite Mr. Dotson's repeated assurances of 'zero malintent' and his confirmation that neither Plaintiff had engaged in any unauthorized conduct, Mayor Hoster directed the Town's outside counsel, Bennett, Tueller, Johnson, & Deere (BTJD), to prepare a legal memorandum addressing the LandWorks contracting matter. According to BTJD attorney Hyrum Bosserman, his letter was intended to clarify internal contracting procedures within the Town and was not intended to suggest criminal wrongdoing by any individual. (Exhibits 2 & 17).

40. BTJD attorney Hyrum Bosserman authored the memorandum (the 'BTJD Memo'). The memo was dated October 10, 2025, two days after it was read publicly at the October 8, 2025 Town Council meeting, indicating it was finalized after its public presentation. The BTJD Memo was not the product of an independent investigation. Mayor Hoster provided BTJD with information that was selective and inaccurate, withheld Mr. Dotson's explanation that the invoice was a clerical error and that Plaintiffs bore no fault, and neither Plaintiffs nor LandWorks were interviewed before the memo was drafted or presented. (Exhibit 18).

41. The BTJD Memo asserted that Plaintiffs had 'independently executed a contract with LandWorks purportedly on behalf of' the Town, that such conduct was 'contrary to both the OPMA and UFPAUT,' and that it was 'done in violation of Utah law.' (Exhibit 18).

**3. Town-funded legal counsel publicly accuses Plaintiffs at October 8 meeting:**

42. During the October 8, 2025 Town Council meeting, BTJD attorney Craig Hall read

13

McNally v. Town of Leeds et al., Complaint

portions of the BTJD Memo aloud to the public, accusing Plaintiff Stirling and Plaintiff McNally of violating Utah law. Meanwhile, Plaintiff Stirling was in northern Utah, attending her dying mother-in-law. She learned of the accusations only when her phone began buzzing with calls from attendees. She had received no prior notice, was never interviewed, and was given no opportunity to respond. The contractor whose billing error formed the sole factual basis for the accusations had told Mayor Hoster on August 26, 2025 that the matter was a clerical mistake and that Plaintiffs bore no fault. Mayor Hoster suppressed this exculpatory information. (Exhibits 17 & 22).

43. During his presentation, Mr. Hall misstated the Town Council-approved project budget as $5,000; the actual approved amount was $9,150. Neither Mayor Hoster nor any Councilmember made any attempt to correct the record after the presentation. (Exhibit 22).

**4. Elimination of public notice venue:**

44. At the October 22, 2025 Town Council meeting, Mayor Hoster revealed that 'complaints' had been made to the postmaster about posting activities, that 'our town's legal provided some feedback to those complaints,' and that the postmaster had responded by prohibiting all postings on postal property. This eliminated the post office's interior bulletin board, one of the three statutory public posting locations the Town had used for years to provide required public notice of Town Council meetings and other municipal business. When Councilmember Peot questioned why all postings had been removed rather than just political materials, Mayor Hoster responded that 'the postmaster actually has jurisdiction over that and elected to have no postings.' (Exhibit 23).

**5. Public posting of draft BTJD Memo:**

45. The following day, on or about October 23, 2025, a draft version of the BTJD Memo was posted on an exterior bulletin board on the wall of the Leeds Trading Post strip mall where the post

14

McNally v. Town of Leeds et al., Complaint

office is located. Unlike the interior post office bulletin board that had just been shut down, this exterior board was an informal community board typically used for yard sale notices and similar postings. The posted document was unmistakably a draft: it lacked a signature, included a '[date]' placeholder, and appeared to have been printed directly from Mayor Hoster's email inbox, indicating it was never publicly released through lawful channels. It was posted directly beside a campaign flyer targeting Plaintiff McNally titled 'Taxpayer Money, No Council Approval.' (Exhibit 5).

46. Wayne Peterson, who served as mayor from 2014 to 2021 and was subsequently elected as the Town's current mayor in 2025, photographed the posted memo and provided a sworn affidavit establishing that the document had not been released through any lawful public records process and that, as a draft of privileged attorney-client communication, it would not be appropriate for anyone, including the mayor, to publicly post it. (Exhibit 5).

## E. Continuing retaliation and defamation

47. After October 8, Mayor Hoster excluded both Plaintiffs from internal Town communications between the mayor's office and the Town Council, denying them information necessary to perform their duties. Plaintiff Stirling was effectively marginalized from governance during her remaining term as Councilmember. Plaintiff McNally was denied the ability to perform her regular duties as an LDWA board member and as cemetery Sexton.

48. On or about October 17, 2025, Mayor Hoster and the Town received a Cease-and-Desist from Plaintiffs' counsel instructing them to cease publicly discussing or commenting on the allegations contained in the BTJD Memo. (Exhibit 19).

49. Notwithstanding receipt of the Cease-and-Desist, Mayor Hoster posted on the official

15

Leeds Town Facebook page on October 24, 2025: "Hurt people sometimes try to hurt others, and that's sad.... As for the recent matter involving Doris McNally's unauthorized actions, this is not a witch hunt or personal attack.... Those materials were properly referred to the Town's legal counsel, independently reviewed, and the findings were read publicly in all transparency before the Town Council." (Exhibit 8).

50. On or about October 24, 2025, Plaintiffs' counsel spoke by telephone with BTJD attorney Hyrum Bosserman, the author of the BTJD Memo. Mr. Bosserman stated that the purpose of his letter was to guide internal policy and clarification within the Town, not to suggest criminal wrongdoing or initiate any form of investigation. On October 26, 2025, Plaintiffs' counsel followed up in writing, informing Mr. Bosserman that the draft version of his letter had been publicly posted on the community bulletin board during the active election campaign, attaching photographs of the posting alongside the final version for comparison, and attaching the LandWorks open letter confirming the clerical error. Plaintiffs' counsel offered draft clarification statements for Mr. Bosserman's consideration and requested a response. On October 27, 2025, Plaintiffs' counsel sent a follow-up email noting the short time remaining before the election and requesting acknowledgment. No response was ever received, and no clarification was issued. (Exhibit 27).

51. Mayor Hoster contacted James Coleman, then-owner of the Leeds Trading Post strip mall where the bulletin board is located, and inquired whether any security cameras were positioned to cover the bulletin board. According to Mr. Coleman, Mayor Hoster had called him on several occasions to pressure him on various matters, and specifically interrogated him about the potential of cameras aimed at the bulletin board, wanting to know if Mr. Coleman or any tenants had cameras positioned there. This inquiry suggests Mayor Hoster was concerned that the posting of the BTJD Memo draft could be traced to its source. (Exhibit J).

52. On November 1, 2025, Mayor Hoster published a statement on the official Leeds Town Facebook page announcing this litigation by name, identifying both Plaintiffs by name and title, declaring that 'all allegations are false,' and stating that Plaintiffs were 'creating legal costs that the Town, and by extension its taxpayers, must now bear.' Mayor Hoster disabled public comments, stating they were turned off 'to avoid misinformation while this matter is pending in court.' The post used the official government platform to deliver a one-sided characterization of the litigation while preventing any public response. (Exhibit 7)

53. The following day, November 2, 2025, Mayor Hoster published a statement on his personal Facebook page characterizing this litigation as 'extortion dressed up as activism,' describing Plaintiffs as 'a small group who were caught misleading the public or abusing their roles,' and calling their supporters 'anonymous bullies trying to rewrite history for their own gain.' Mayor Hoster stated he was 'not running again,' confirmed his wife's candidacy was connected to the dispute by praising her for 'being willing to step up in the middle of the chaos a few have stirred up,' and contrasted her willingness to 'serve the people' against Plaintiffs who he said wanted to 'SERVE the people with a lawsuit.' (Exhibit 13)

54. After the November 2025 general election, in which both Plaintiff McNally and Mrs. Hoster lost, Mrs. Hoster continued the defamatory campaign against Plaintiff McNally. On or about February 3, 2026, at an LDWA board election, Mrs. Hoster approached community members and stated they needed to "get rid of" Plaintiff McNally because she had "misappropriated town funds." This statement was false, repeated the narrative originated by the BTJD Memo, and was witnessed by a person with firsthand knowledge who is available to testify. Plaintiff McNally won the water board election despite Mrs. Hoster's efforts.

McNally v. Town of Leeds et al., Complaint

**F. Harm to Plaintiffs:**

55. The defamatory publications occurred at the precise moment of maximum electoral impact, when ballots were being mailed to voters and final opinions were forming. Plaintiff McNally had finished second in the August 2025 primary election with 149 votes, while Mrs. Hoster received the fewest votes among advancing candidates with 107 votes. However, in the November general election following Mayor Hoster's systematic defamation campaign, Plaintiff McNally received only 175 votes (22.26%), finishing third out of four candidates and missing a council seat by 17 votes. Mrs. Hoster received 174 votes (22.14%) and finished fourth. (Exhibits 20), Exhibit B).

56. During the October 8, 2025 Town Council meeting, Town-funded legal counsel publicly accused Plaintiff Stirling of criminal conduct before the Council and the public. Meanwhile, Plaintiff Stirling was in northern Utah, attending her dying mother-in-law. She learned of the accusations only when her phone began buzzing with calls from attendees. In the months that followed, the BTJD Memo defamation and Mayor Hoster's sustained pattern of demeaning conduct toward women serving on the Town Council drove Plaintiff Stirling to withdraw from community involvement in Leeds entirely, including social activities she had organized for years. The Stirlings were among the handful of families who founded the Town of Leeds. Plaintiff Stirling now questions whether she can continue to live there.

57. Both Plaintiffs have suffered severe distress, embarrassment, and reputational harm. In a town of 840 residents, false accusations of criminal conduct spread rapidly. Plaintiff McNally received numerous inquiries demanding she respond to the allegations, and her campaign materials were removed and replaced with negative content.

**G. Mayor Hoster's abuse of mayoral authority; Town's enabling of this abuse:**

McNally v. Town of Leeds et al., Complaint

58. Mayor Hoster misused governmental power under color of state law to further his personal interests and support his political allies. The Town Council's repeated failure to check that conduct enabled Mayor Hoster to act with increasing impunity.

**1. Mayor Hoster abuses governmental power under the color of state law:**

59. Each instrumentality Mayor Hoster deployed was available to him solely by virtue of his office: the Town's official Facebook page, Town-funded legal counsel, official Town Council proceedings, and his control over meeting agendas and Town communications. His concurrent personal and political motives do not defeat color of law. *See Jojola v. Chavez*, 55 F.3d 488 (10th Cir. 1995); *David v. City & County of Denver*, 101 F.3d 1344 (10th Cir. 1996).

**2. Town shares liability as Mayor Hoster was its final policymaker:**

60. Mayor Hoster was the Town's chief executive officer and final policymaker for the instruments of municipal authority. His final, unreviewable authority over the Town's public communications, engagement of outside legal counsel, and conduct of Town Council meetings made his actions on those matters the actions of the municipality itself. *See Simmons v. Uintah Health Care Special Dist.*, 506 F.3d 1281 (10th Cir. 2007)

**3. The Town is independently liable under Monell's deliberate indifference theory:**

61. The Town Council maintained a well-settled custom of permitting Mayor Hoster to act unilaterally without oversight, established well before the October 2025 defamation. As detailed in the preceding sections, the Council repeatedly failed to intervene as Mayor Hoster terminated the Town Clerk without required Council approval, authorized a $221,972 road project without procurement or Council authorization, donated $10,000 in Town funds to the Sheriff's Department

McNally v. Town of Leeds et al., Complaint

without Council authorization, assumed unilateral control of the official Town Facebook page, dissolved the Bloom Committee, and removed Plaintiff McNally's LDWA reports from the Council agenda. *See* 12, 18-19, 22, 27, above.

62. At the October 22, 2025 Town Council meeting, Mayor Hoster disclosed that his private company was providing website services to the Town at no charge to redesign the Town's official website. This gave Mayor Hoster personal control over yet another official Town communications platform, consistent with his pattern of consolidating control over the Town's public-facing channels, including his unilateral takeover of the Town's official Facebook page following the termination of Town Clerk Rutherford.

63. By October 8, 2025, this pattern of deliberate indifference was permanent and well settled, and constituted the moving force behind the constitutional violations alleged herein. *See Hinkle v. Beckham Cnty. Bd. of Cnty. Comm'rs*, 962 F.3d 1204 (10th Cir. 2020).

64. The Council's failure to check Mayor Hoster was not coincidental. Councilman Furley simultaneously served as HVFSSD Deputy Fire Chief under Mayor Hoster's authority as HVFSSD Chairman, making his continued employment dependent on Mayor Hoster's goodwill; Furley voted with Mayor Hoster on every contested council matter, including voting to table Plaintiff Stirling's audit request (after initially helping to prepare the audit request letter). Councilman Cundick acted as Mayor Hoster's political ally, including canceling a citizen forum at the Mayor's direction. With Furley structurally compromised and Cundick aligned, the Council lacked the independent majority needed to check the Mayor's conduct. Neither Furley's dual employment nor Cundick's role in canceling the citizen-organized candidate forum at the Mayor's direction was ever disclosed.

McNally v. Town of Leeds et al., Complaint

## V. CLAIMS FOR RELIEF

65. Plaintiffs incorporate all preceding paragraphs by reference.

### COUNT I: First Amendment Retaliation (42 U.S.C. § 1983)

(*By Both Plaintiffs, Against Defendant William Hoster and Defendant Town of Leeds*)

66. To establish First Amendment retaliation, a plaintiff must show that she engaged in protected activity, that the defendant took adverse action against her, and that the protected activity was a substantial motivating factor in the adverse action. *See Worrell v. Henry*, 219 F.3d 1197 (10th Cir. 2000); *Leverington v. City of Colo. Springs*, 643 F.3d 719 (10th Cir. 2011).

67. Plaintiff McNally engaged in protected activity including political candidacy and public criticism of Mayor Hoster. Plaintiff Stirling engaged in protected activity including public speech criticizing religious exclusion in town politics, requesting a full audit of Town finances in her capacity as a Councilmember, and exercising legislative oversight over the administration.

68. Mayor Hoster responded with a sustained campaign of adverse actions against both Plaintiffs that, taken together, would chill a person of ordinary firmness from continuing to engage in protected speech and political activity. These include:

    a. Dissolving the Bloom Committee, stripping Plaintiff McNally of her public-facing role as Treasurer and committee member;

    b. Curtailing Plaintiff McNally's monthly LDWA reports from the monthly Town Council agenda;

    c. Excluding Plaintiff McNally from the "Meet the Candidates" event at the LDS Bishop's home;

    d. Publishing a public attack on Plaintiff Stirling on the official Town Facebook page

McNally v. Town of Leeds et al., Complaint

in direct response to her protected speech about religious exclusion, and characterizing her audit request as an "agenda of paranoia;"

e. Commissioning the BTJD Memo through Town-funded counsel based on information Mayor Hoster knew to be false;

f. Causing the BTJD Memo to be read publicly at the October 8 Town Council meeting and be presented as the final conclusion of an independent investigation;

g. Posting or having posted a privileged draft of the BTJD Memo on a public bulletin board alongside partisan campaign material targeting Plaintiff McNally;

h. Publishing statements on the official Town Facebook page naming and criticizing Plaintiff McNally, including after receipt of Plaintiffs' Cease-and-Desist;

i. Excluding both Plaintiffs from internal Town communications and denying them information necessary to perform their duties; and

j. Threatening legal action against Plaintiffs based on information Mayor Hoster knew to be false, in context of his pattern of using law enforcement against critics.

69. These adverse actions were substantially motivated by Plaintiffs' protected activity, as demonstrated by their consistent pattern of following directly from each Plaintiff's public criticism, legislative oversight, and political candidacy.

**COUNT II: Due Process (Stigma-Plus) (42 U.S.C. § 1983, Fourteenth Amendment)**

(*By Plaintiff Stirling, Against Defendant Hoster and Defendant Town of Leeds*)

70. To establish a stigma-plus claim, a plaintiff must show that the government made a stigmatizing statement in connection with a deprivation of a tangible interest protected by state law. Where the government publicly accuses an individual of criminal conduct in connection with

a deprivation of a protected interest, the individual is entitled to notice and an opportunity to be heard. *See Workman v. Jordan*, 32 F.3d 475 (10th Cir. 1994); *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532 (1985).

71. Mayor Hoster, through Town-funded legal counsel, publicly accused Plaintiff Stirling of violating Utah law at the October 8, 2025 Town Council meeting. The accusations were made in an official governmental proceeding, presented as the conclusions of a legal investigation, and explicitly stated that Plaintiff Stirling's conduct was "in violation of Utah law."

72. Plaintiff Stirling received no notice that accusations of criminal conduct would be made against her at a public meeting, was never interviewed, and was given no opportunity to respond before or after the accusations were published. She was absent from the October 8 meeting because she was attending her dying mother-in-law, and was therefore unable to respond even had she received notice. As established in Section D above, Mayor Hoster suppressed directly exculpatory information from the contractor whose clerical error was the sole factual basis for the accusations, and proceeded regardless.

73. The stigma was compounded by concrete deprivations: following October 8, Plaintiff Stirling was excluded from internal communications between the mayor's office and the Council, denied information necessary to perform her legislative duties, and effectively marginalized from governance during her remaining term. These deprivations constituted a tangible alteration of Plaintiff Stirling's legally protected interest in performing her duties as an elected Town Councilmember, satisfying the "plus" element of the claim.

74. Plaintiff Stirling has received no name-clearing hearing or any process of any kind, and the stigmatizing accusations remain uncorrected in the public record.

McNally v. Town of Leeds et al., Complaint

## COUNT III: Equal Protection / Religious Discrimination (42 U.S.C. § 1983)

(*By Plaintiff McNally, Against Defendant Hoster and Defendant Town of Leeds*)

75. The Equal Protection Clause prohibits intentional discrimination based on religion by state actors. To establish an Equal Protection violation based on religious discrimination, a plaintiff must show that a state actor intentionally treated her differently from similarly situated individuals based on her religion. *Shrum v. City of Coweta*, 449 F.3d 1132 (10th Cir. 2006); *Axson-Flynn v. Johnson*, 356 F.3d 1277 (10th Cir. 2004).

76. Plaintiff McNally, as a non-LDS person, is a member of a class protected from religious discrimination under the Equal Protection Clause. Plaintiff Stirling, as an LDS member who publicly defended non-LDS inclusion in town politics, was targeted by Mayor Hoster in direct response to her religiously-motivated advocacy. Both Plaintiffs' claims arise from Mayor Hoster's pattern of using official authority to enforce religious favoritism in the governance of Leeds.

77. Mayor Hoster intentionally treated Plaintiff McNally differently from similarly situated LDS candidates based on her non-LDS religious status. He and his wife organized and promoted a "Meet the Candidates" event using official Town communications channels, held at the personal residence of the local LDS Bishop, to which only LDS candidates were invited; Plaintiff McNally was excluded. He used the official Town Facebook page to publish campaign promotion for his wife, an LDS candidate running for the same seats as Plaintiff McNally, while providing no comparable platform to any other candidate. His pattern of preferential treatment toward LDS community members, documented by Robin Snyder's on-the-record statement at the May 28, 2025 Town Council meeting described in ¶16 above, establishes that this differential treatment was motivated by religious animus rather than any legitimate governmental purpose.

78. Mayor Hoster's religious animus is further demonstrated by his response to Plaintiff

24

Stirling's advocacy on behalf of non-LDS residents. After Plaintiff Stirling publicly criticized the exclusion of non-LDS candidates from the Bishop's home event, stating that faith 'should never be a gatekeeper to community leadership,' Mayor Hoster responded the following day with a public attack on the official Town Facebook page, accusing her of 'misleading attacks and false accusations,' questioning her loyalty to the community, and demanding a public apology. His willingness to publicly retaliate against even an LDS councilmember who defended non-LDS inclusion confirms that his differential treatment of Plaintiff McNally was motivated by religious animus.

79. As a direct and proximate result of Mayor Hoster's religiously discriminatory conduct, Plaintiff McNally suffered exclusion from political participation, loss of her Town Council candidacy, reputational harm, emotional distress, and other damages in amounts to be proven at trial. Mayor Hoster's differential treatment of Plaintiff McNally on the basis of religion cannot survive strict scrutiny, as it was not narrowly tailored to serve any compelling governmental interest.

80. For clarity and transparency, Plaintiffs again assert upon information and belief that none of the aforementioned religious discrimination was perpetrated by, at the instruction of, or with the knowledge of either the local LDS Bishop or the LDS Church as an organization.

### COUNT IV: Conspiracy to Interfere with Civil Rights (42 U.S.C. § 1985(3))

(*By Plaintiff McNally, Against Defendants William Hoster and Troi Gee Hoster*)

81. 42 U.S.C. § 1985(3) prohibits conspiracies motivated by class-based animus to deprive persons of equal protection. The Tenth Circuit requires: (1) a conspiracy; (2) to deprive a person of equal protection or equal privileges and immunities; (3) an act in furtherance of the conspiracy;

McNally v. Town of Leeds et al., Complaint

and (4) resulting injury or deprivation. The conspiracy must be motivated by "some racial, or perhaps otherwise class-based, invidiously discriminatory animus." *Griffin v. Breckenridge*, 403 U.S. 88 (1971); *Tilton v. Richardson*, 6 F.3d 683 (10th Cir. 1993)

82. Mayor Hoster and Mrs. Hoster, as husband and wife jointly invested in Mrs. Hoster's political candidacy, reached an agreement to use Mayor Hoster's official authority and Mrs. Hoster's public statements to deprive Plaintiff McNally of her equal protection rights as a non-LDS candidate. Each acted in their individual capacity pursuing separate interests: Mayor Hoster as an elected official protecting his wife's candidacy and his administration, Mrs. Hoster as a candidate seeking electoral advantage. The conspiracy was motivated by class-based animus against non-LDS persons, as evidenced by Mayor Hoster's documented pattern of preferential treatment toward LDS community members, his organization of a candidate event that excluded non-LDS participants, and his use of official Town resources to promote his LDS wife's candidacy while denying comparable access to Plaintiff McNally.

83. In furtherance of this conspiracy, Defendants committed the following overt acts: Mayor Hoster and his wife Troi Hoster organized and promoted the Bishop's home candidate event using official Town communications channels, excluding Plaintiff McNally on the basis of her religion while inviting only LDS candidates; Mayor Hoster used the official Town Facebook page to publish campaign promotion for Mrs. Hoster while providing no comparable platform to Plaintiff McNally or any other candidate; and Mrs. Hoster, on or about February 3, 2026, told community members at the LDWA water board election that they needed to "get rid of" Plaintiff McNally because she had "misappropriated town funds," repeating the false narrative originated by the BTJD Memo.

84. As a direct and proximate result of this conspiracy, Plaintiff McNally suffered deprivation

McNally v. Town of Leeds et al., Complaint

of her equal protection rights, loss of her Town Council candidacy, reputational harm, emotional distress, and ongoing harm to her standing in the community.

### COUNT V: Conspiracy Under 42 U.S.C. § 1983

(*By Both Plaintiffs, Against Defendants William Hoster and Troi Gee Hoster*)

85. Independently of and in addition to the § 1985(3) claim above, Plaintiffs allege conspiracy under 42 U.S.C. § 1983. A private person who conspires with a state actor to deprive another of constitutional rights acts under color of state law. *Dennis v. Sparks*, 449 U.S. 24 (1980). To establish a § 1983 conspiracy claim, a plaintiff must show: (1) an agreement between a state actor and a private party; (2) to deprive the plaintiff of constitutional rights under color of state law; and (3) an overt act in furtherance of the conspiracy causing injury. *Sigmon v. Community Care HMO*, 234 F.3d 1121 (10th Cir. 2000). Mrs. Hoster, though not independently subject to § 1983 liability, acted under color of state law by virtue of her agreement and concerted action with Mayor Hoster, who exercised official governmental authority in furtherance of their shared objectives.

86. Based on the facts, there is a plausible inference of agreement between Mayor Hoster and Mrs. Hoster to deprive Plaintiffs of their constitutional rights. Mayor Hoster used the official Town Facebook page to publish campaign promotion for Mrs. Hoster while denying comparable access to Plaintiff McNally, his wife's political opponent. Mayor Hoster and Mrs. Hoster jointly organized and promoted the LDS Bishop's home "Meet the Candidates" event, from which Plaintiff McNally was excluded on religious grounds. Mayor Hoster commissioned and disseminated the BTJD Memo through official Town legal counsel, creating the false narrative that Plaintiffs had misappropriated Town funds. On or about February 3, 2026, Mrs. Hoster repeated that same specific false narrative at the LDWA water board election, telling community members that

27

Plaintiff McNally had "misappropriated town funds" and that they needed to "get rid of" her.

87. The overt acts taken in furtherance of this conspiracy include: Mayor Hoster's use of official Town resources to promote Mrs. Hoster's candidacy and suppress Plaintiff McNally's political standing; Mayor Hoster's commissioning and public dissemination of the BTJD Memo through Town-funded counsel, publicly accusing both Plaintiffs of criminal conduct based on information he knew to be false; Mayor Hoster's posting or causing to be posted the draft BTJD Memo on the public bulletin board alongside partisan campaign material targeting Plaintiff McNally; Mayor Hoster's exclusion of both Plaintiffs from internal Town communications following the October 8 meeting; and Mrs. Hoster's repetition of the false misappropriation narrative at the LDWA water board election after this litigation was initiated. The BTJD Memo campaign was directed at both Plaintiffs; the water board statement was directed specifically at Plaintiff McNally and constituted a continuation of the conspiracy after the November 2025 election.

88. As a direct and proximate result of this conspiracy, Plaintiffs suffered deprivation of their First Amendment and Equal Protection rights, loss of political opportunity, reputational harm, emotional distress, exclusion from the performance of their civic duties, and other damages in amounts to be proven at trial.

## COUNT VI: Defamation (Common Law)

(*By Plaintiff McNally, Against Defendant Troi Gee Hoster*)

89. Under Utah common law, defamation per se occurs when a defendant publishes a false statement that imputes criminal conduct to the plaintiff, and is actionable without proof of special damages. *Seegmiller v. KSL Inc.*, 626 P.2d 968 (Utah 1981). The Utah Governmental Immunity

28

McNally v. Town of Leeds et al., Complaint

Act does not apply to claims against Mrs. Hoster, who is not and was not a government employee or official.

90. On or about February 3, 2026, at the LDWA annual water board election, Mrs. Hoster stated to community members present that Plaintiff McNally had "misappropriated town funds" and that they needed to "get rid of" her. A witness with firsthand knowledge of these statements is available to testify.

91. These statements were false. The billing discrepancy at the center of the misappropriation narrative was a clerical error by LandWorks' office manager, committed with zero malintent and entirely unrelated to any conduct by Plaintiff McNally, as established by LandWorks President Dotson's October 12, 2025 open letter and his direct communications with Mayor Hoster. No funds were misappropriated, no criminal charges were ever filed, and the Town's own outside counsel characterized the matter as a procurement procedure issue. Statements imputing the misappropriation of public funds are defamatory per se under Utah common law.

92. Mrs. Hoster made these statements with knowledge of their falsity or with reckless disregard for their truth or falsity. By February 3, 2026, this litigation had been filed, the LandWorks open letter had been published, and the false nature of the misappropriation narrative had been publicly established. Mrs. Hoster had direct access to these facts through her husband, who had been informed by Mr. Dotson on August 26, 2025, that the billing issue was a clerical error and that Plaintiffs bore no fault. Mrs. Hoster published these statements at an LDWA board election in which Plaintiff McNally was a candidate, maximizing their potential to harm Plaintiff McNally's electoral prospects and community standing.

93. As a direct and proximate result of Mrs. Hoster's defamatory statements, Plaintiff McNally suffered reputational harm, emotional distress, and ongoing damage to her standing in the Leeds

29

McNally v. Town of Leeds et al., Complaint

community, in amounts to be proven at trial.

## COUNT VII: Defamation (Common Law)

(*By Both Plaintiffs, Against Defendant William Hoster, Individually*)

94. Under Utah common law, defamation per se occurs when a defendant publishes a false statement that imputes criminal conduct to the plaintiff. *Seegmiller v. KSL Inc.*, 626 P.2d 968 (Utah 1981). Defendant William Hoster is sued in his individual capacity. To the extent any official immunity might otherwise attach, the publications alleged in this count were made outside the scope of Mayor Hoster's official duties, constituted willful misconduct, and are therefore not protected by the Utah Governmental Immunity Act. *Fuja v. Stephens*, 575 P.3d 1184 (Utah Ct. App. 2025); Utah Code § 63G-7-202(3)(c)(i).

95. No legitimate mayoral function includes leaking privileged draft attorney-client documents onto a public bulletin board alongside partisan campaign material, publishing personal attacks on named individuals after receiving a Cease-and-Desist, or using an official government platform to announce and defend personal litigation while disabling public response.

96. Mayor Hoster made the following defamatory publications, each of which imputed criminal conduct or conduct incompatible with the proper exercise of Plaintiffs' public roles and is therefore defamatory per se:

    a. On July 24, 2025, Mayor Hoster published an attack on Plaintiff Stirling on the official Town Facebook page accusing her of 'misleading attacks and false accusations,' characterizing her statements as 'false, inflammatory, and irresponsible,' questioning her loyalty to the community, and demanding a public apology. (Exhibit 11).

30

McNally v. Town of Leeds et al., Complaint

b. On or about October 23, 2025, a draft of the BTJD Memo was posted or caused to be posted on an exterior bulletin board on the wall of the Leeds Trading Post strip mall where the post office is located, alongside a campaign flyer targeting Plaintiff McNally. Only Mayor Hoster and BTJD attorneys had copies of this draft at this time. (Exhibit 5).

c. On October 24, 2025, after receipt of Plaintiffs' Cease-and-Desist, Mayor Hoster published a statement on the official Town Facebook page naming Plaintiff McNally and characterizing her conduct as 'unauthorized,' falsely stating the matter had been 'independently reviewed.' (Exhibit 8).

d. On November 1, 2025, Mayor Hoster published a statement on the official Town Facebook page announcing this litigation, characterizing all allegations as false, and framing Plaintiffs as a financial burden on taxpayers while disabling public comments. (Exhibit 23).

e. On November 2, 2025, Mayor Hoster published a statement on his personal Facebook page characterizing this litigation as 'extortion dressed up as activism' and describing Plaintiffs' supporters as having been 'taken advantage of through gaslighting and manipulation.' (Exhibit 24).

97. Each publication was false, made with knowledge of its falsity or reckless disregard for truth, and made with intent to harm Plaintiffs' reputations, interfere with Plaintiff McNally's candidacy, retaliate against Plaintiff Stirling for her protected speech, and shield Mayor Hoster's administration from scrutiny. The falsity of the underlying narrative is established in Section D above. The November 1 and November 2 publications, made after service of litigation, demonstrate that Mayor Hoster's defamatory conduct was conscious, deliberate, and continuing,

McNally v. Town of Leeds et al., Complaint

and support an award of punitive damages.

98. To the extent any conditional privilege attaches to any of these publications, Mayor Hoster abused that privilege through knowledge of falsity, ill will toward Plaintiffs, and excessive publication beyond any privileged occasion. *Russell v. Thomson Newspapers, Inc.*, 842 P.2d 896 (Utah 1992).

99. As a direct and proximate result of these publications, both Plaintiffs suffered reputational harm, emotional distress, loss of political opportunity, interference with the performance of their civic duties, and other damages in amounts to be proven at trial.

### COUNT VIII: Civil Conspiracy (Common Law)

(*By Both Plaintiffs, Against Defendants William Hoster and Troi Gee Hoster*)

100.　　　　Under Utah common law, civil conspiracy requires: (1) a combination of two or more persons; (2) an object to be accomplished; (3) a meeting of the minds on the object or course of action; (4) one or more unlawful overt acts in furtherance of the conspiracy; and (5) damages as a proximate result. *Israel Pagan Estate v. Cannon*, 746 P.2d 785 (Utah Ct. App. 1987).

101.　　　　The Utah Governmental Immunity Act does not apply to claims against Mrs. Hoster, who is not and was not a government employee or official. To the extent any immunity argument is raised as to Mayor Hoster individually, the conduct alleged in this count was outside the scope of his official duties and constituted willful misconduct as alleged in Count VII above.

102.　　　　Defendants William Hoster and Troi Gee Hoster combined and agreed to accomplish the unlawful objectives of defaming Plaintiffs, interfering with Plaintiff McNally's Town Council candidacy, and protecting Mrs. Hoster's competing candidacy through false accusations of criminal conduct. The inference of agreement is supported by the facts alleged in

McNally v. Town of Leeds et al., Complaint

Count V above: Mayor Hoster used official Town resources to promote Mrs. Hoster's candidacy while suppressing Plaintiff McNally's public standing; the Hosters jointly organized and promoted the Bishop's home candidate event from which Plaintiff McNally was excluded; Mayor Hoster commissioned and disseminated the BTJD Memo creating the false misappropriation narrative; and Mrs. Hoster repeated that same narrative at the LDWA water board election after this litigation was filed.

103.     The unlawful overt acts taken in furtherance of this conspiracy are those alleged in Count V, and in both Counts VI and VII above, each of which constitutes defamation per se under Utah common law. In addition, Mrs. Hoster's publication of false statements at the LDWA water board election caused Plaintiff McNally to suffer interference with her subsequent candidacy for the LDWA board, a harm distinct from and additional to the Town Council election damages suffered by both Plaintiffs.

104.     As a direct and proximate result of this conspiracy, both Plaintiffs suffered reputational harm, emotional distress, loss of political opportunity, interference with the performance of their civic duties, and other damages in amounts to be proven at trial.

**COUNT IX: Intentional Interference with Prospective Electoral Relations (Common Law)**

*(By Plaintiff McNally, Against Defendants William Hoster and Troi Gee Hoster)*

105.     Under Utah common law, a plaintiff may recover for intentional interference with prospective relations where a defendant intentionally interferes with the plaintiff's prospective economic 'or other relations' through improper means or for an improper purpose. *Leigh Furniture & Carpet Co. v. Isom*, 657 P.2d 293, 307 (Utah 1982). Improper means include conduct that is independently wrongful, including defamation, fraud, and violations of law. Improper purpose

33

McNally v. Town of Leeds et al., Complaint

includes conduct motivated by malice or designed primarily to injure the plaintiff rather than to advance any legitimate interest of the defendant. *Id.* The 'or other relations' language in *Leigh Furniture* is not limited to commercial transactions; it encompasses any prospective relationship in which a plaintiff holds a reasonable expectation of advantage. A candidate's prospective relationship with the electorate, the right to compete for votes free from intentional and unlawful interference, is a cognizable prospective relation under this standard.

106.    Plaintiff McNally held two cognizable prospective electoral relations. First, as a candidate for Leeds Town Council in the November 2025 general election, she had a prospective relationship with the Leeds electorate and a right to compete for votes on equal footing with other candidates. Second, as a candidate for the LDWA water board in February 2026, she had a prospective relationship with the members of the Leeds Domestic Water-users Association.

107.    Defendants intentionally interfered with these prospective electoral relations through improper means and for an improper purpose. Mayor Hoster timed the BTJD Memo's public dissemination to the precise window when ballots were being mailed to voters in the November 2025 election, maximizing its potential to corrupt the electoral process against Plaintiff McNally. Mrs. Hoster continued the interference at the LDWA water board election by repeating the false misappropriation narrative to community members present at that election. The means were independently wrongful: as alleged in Counts VI, VII, and VIII above, Defendants published statements constituting defamation per se, caused Town-funded legal counsel to manufacture and disseminate a false legal conclusion for political purposes, caused a privileged draft attorney-client document to be posted on a public bulletin board alongside partisan campaign material, and published false accusations after receipt of a Cease-and-Desist letter.

108.    The purpose of the interference was improper. Mayor Hoster's primary objective

McNally v. Town of Leeds et al., Complaint

was not to advance any legitimate governmental interest but to protect his wife's electoral prospects and silence critics of his administration. Mrs. Hoster's primary objective at the water board election was to damage Plaintiff McNally's standing in a subsequent electoral contest after this litigation had been initially filed. Neither defendant had any legitimate interest justifying the interference.

109.    Defendants' interference deprived Plaintiff McNally of the ability to compete for public office free from intentional and unlawful manipulation of the electoral process. Plaintiff McNally lost the November 2025 Town Council election by a narrow margin, in an election in which Defendants' defamatory publications were timed to the precise moment when ballots were being mailed and voters were forming final opinions. Defendants' interference with Plaintiff McNally's subsequent water board candidacy caused additional reputational harm and emotional distress. As a direct and proximate result, Plaintiff McNally suffered loss of her Town Council candidacy, deprivation of her right to compete in a fair electoral process, reputational harm, emotional distress, and other damages in amounts to be proven at trial.

## VI. JURY DEMAND

1.  Plaintiffs demand a trial by jury on all claims.

## VII. PRAYER FOR RELIEF

2.  Plaintiffs respectfully request judgment against Defendants as follows:

 a.  Compensatory damages pursuant to 42 U.S.C. § 1983 for violations of Plaintiffs' rights under the First and Fourteenth Amendments;

 b.  Declaratory relief that Defendants' conduct violated Plaintiffs' constitutional rights;

 c.  A name-clearing hearing for Plaintiff Stirling before a neutral decisionmaker;

35

McNally v. Town of Leeds et al., Complaint

d. Compensatory damages for reputational harm, emotional distress, interference with Plaintiff McNally's electoral candidacies, and all other economic and non-economic losses;

e. Punitive damages against Defendant William Hoster in his individual capacity;

f. Punitive damages against Defendant Troi Gee Hoster in her individual capacity;

g. Attorneys' fees and costs under 42 U.S.C. § 1988 and other applicable law;

h. Pre- and post-judgment interest; and

i. Such other relief as the Court deems just and proper.

DATED this 17th day of April, 2026.

BEAR Law Group

/s/ Amanda M. Hansen
Amanda M. Hansen (17227)

/s/ Nathaniel F. McKean
Nathaniel F. McKean (17273)

*Attorneys for Plaintiffs*
532 N Colorado St, Salt Lake City, UT 84116
(801) 448-6167; bearlawgroup@outlook.com

McNally v. Town of Leeds et al., Complaint

**LIST OF EXHIBITS:**

| | | |
|---|---|---|
| Exhibit 1 | McNally, sworn statement | Oct. 27, 2025 |
| Exhibit 2 | Stirling, sworn statement | Oct. 28, 2025 |
| Exhibit 3 | Brown, sworn statement | Oct. 24, 2025 |
| Exhibit 4 | Ham, sworn statement | Oct. 26, 2025 |
| Exhibit 5 | Peterson, sworn statement | Oct. 27, 2025 |
| Exhibit 6 | FB post, Leeds Town, Troi Hoster campaigning | Oct. 19, 2025 |
| Exhibit 7 | FB post, Leeds Town, litigation announcement | Nov. 1, 2025 |
| Exhibit 8 | FB post, Leeds Town, 'Hurt people...' | Oct. 24, 2025 |
| Exhibit 9 | FB post, Leeds Town, reelection announcement | Apr. 4, 2025 |
| Exhibit 10 | FB post, Leeds Town, 'bless your heart' | June 9, 2025 |
| Exhibit 11 | FB post, Leeds Town, attack on Stirling re. Bishop | July 24, 2025 |
| Exhibit 12 | FB post, Stirling re. Bishop | July. 23, 2025 |
| Exhibit 13 | FB post, Bill Hoster (personal), 'extortion' | Nov. 2, 2025 |
| Exhibit 14 | Leeds Town Quarterly Newsletter, Jan 2025 | Jan 2025 |
| Exhibit 15 | Email, town clerk | Mar. 31, 2025 |
| Exhibit 16 | Open letter, Stirling | Sept. 24, 2025 |
| Exhibit 17 | Open letter, LandWorks | Oct. 10, 2025 |
| Exhibit 18 | BTJD memo, final | Oct. 10, 2025 |
| Exhibit 19 | Cease-and-Desist, to Defendants | Oct. 16, 2025 |
| Exhibit 20 | Washington County 2025 Utah Municipal Primary | Aug. 12, 2025 |
| Exhibit 21 | Town Meeting minutes | May 14, 2025 |
| Exhibit 22 | Town Council minutes | Oct. 8, 2025 |
| Exhibit 23 | Town Council minutes | Oct. 22, 2025 |
| Exhibit 24 | HintonBurdick Independent Accountant Report | Oct. 22, 2025 |
| Exhibit 25 | Municipal Election Results | Nov. 2025 |
| Exhibit 27 | Email, Hansen to Bosserman | Oct. 26, 2025 |